UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

LI-WEI KAO,

                          Plaintiff,

            v.                                              DECISION AND ORDER
                                                            11-CV-415S
ERIE COMMUNITY COLLEGE,
ERIE COUNTY, and BUFFALO AND ERIE
COUNTY WORKFORCE DEVELOPMENT
CONSORTIUM, INC.,
                          Defendants.

_____

## I. INTRODUCTION

Plaintiff Li-Wei Kao brings this employment discrimination action against Erie Community College ("ECC"), Erie County, and Buffalo and Erie County Workforce Development Consortium, Inc. ("WDC") pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), Civil Rights Act of 1870, as amended, 42 U.S.C. § 1981 ("Section 1981"), and § 290 et seq. of the New York Human Rights Law ("NY HRL"). Plaintiff alleges that he was discriminated against on the basis of his race and national origin and that he was retaliated against for engaging in protected activities.

This Court has federal question jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331. As discussed below, pursuant to New York Exec. Law § 297(9), this Court has no jurisdiction over Plaintiff's NY HRL claims. All defendants moved for Summary Judgment on all relevant claims. For the reasons stated below,

ECC's Motion is GRANTED, Erie County's Motion is GRANTED, and WDC's Motion is GRANTED.

## II. BACKGROUND[1]

Plaintiff is a person of Taiwanese national origin and is employed by Defendant ECC as a part-time instructor of non-credit remedial computer classes. (Complaint, ¶1; ECC Stmt., ¶¶2,6). As discussed in more detail below, Plaintiff's retaliation and discrimination claims relate to events that occurred during two separate time periods. First, he alleges certain acts of discrimination and retaliation during approximately May to November of 2008, beginning during the time he taught at the Buffalo and Erie County Training Center ("BETC") (ECC Stmt., ¶ 4), and until he was reassigned to teach similar classes at another location in Buffalo ("45 Oak Street"). (ECC Stmt., ¶¶6,13,15; Plaintiff ECC Stmt., ¶¶6,15). Second, he alleges retaliatory actions taken against him during late 2009 and 2010, which had a negative impact on his ability to continue to

---

1 The Court's account of the underlying facts of this case is drawn from the parties' submissions in support of and in opposition to the instant motion, including:

(1) Defendant ECC's Rule 56.1 Statement ("ECC Stmt.") (Docket No. 43); the Declaration of Matthew C. Van Vessem in Support of ECC's Motion for Summary Judgment ("Van Vessem Decl.") (Docket No. 40-1) and attached exhibits (Docket Nos. 45-65); the Declaration of Carrie Kahn in Support of ECC's Motion for Summary Judgment ("Kahn Decl.") (Docket No. 41) and attached exhibits; the Declaration of Darley Willis in Support of ECC's Motion for Summary Judgment ("Willis Decl.") (Docket No. 42) and attached exhibits; Plaintiff's Local Rule 56.1 Statement ("Pl. 56.1") (Docket No.47); Memorandum in Support of ECC's Motion for Summary Judgment ("ECC Memorandum") (Docket. No 44); Reply Declaration of Matthew C. Van Vessem ("Van Vessem Reply Decl.") (Docket No. 81); Reply Declaration of Carrie Kahn ("Kahn Reply Decl.") (Docket No. 82) and attached exhibits; Memorandum of Law in Reply and in Further and Other Support of ECC's Motion for Summary Judgment ("ECC Reply") (Docket No. 83).

(2) Defendant Erie County's Rule 56.1 Statement ("Erie County Stmt.") (Docket No. 67-2) and Appendix (Docket No. 67-3) and attached exhibits (Docket No. 67-4); Declaration of Randolph C. Oppenheimer in Support of Erie County's Motion for Summary Judgment (Docket No. 67-1); Memorandum of Law in Support of Erie County's Motion for Summary Judgment ("Erie County Memorandum") (Docket No. 67-5); Reply in Support of Erie County's Motion for Summary Judgment ("Erie County Reply") (Docket No. 79).

(3) Defendant WDC's Rule 56.1 Statement ("WDC Stmt.") (Docket No. 68-1) and Appendix (Docket No. 68-2); Declaration of Cheryl Smith Fisher in Support of WDC's Motion for Summary Judgment (Docket No. 68-3) and attached exhibits; Memorandum of Law in Support of WDC's Motion for Summary Judgment ("WDC Memorandum") (Docket No. 68-10); Reply in Support of WDC's Motion for Summary Judgment ("WDC Reply") (Docket No. 80).

(4) Declaration of Li-Wei Kao in Opposition to Defendants' Motion for Summary Judgment ("Plaintiff Decl.") (Docket No. 75) and attached exhibits (Docket Nos. 74,75); Memorandum in Opposition to Defendants' Motions for Summary Judgment ("Opposition") (Docket No. 76); Plaintiff's responses to Rule 56.1 Statements of ECC ("Plaintiff ECC Stmt.") (Docket No. 77), Erie County ("Plaintiff Erie County Stmt.") (Docket No. 76-1), and WDC ("Plaintiff WDC Stmt.") (Docket No. 78).

teach regularly at 45 Oak Street.  (ECC Stmt., ¶23; Plaintiff ECC Stmt., ¶23).  His 2010 New York State Division of Human Rights ("NYSDHR") complaint and this law suit followed.

### A.   Procedural History

On July 19, 2010, Plaintiff filed a Verified Complaint with the NYSDHR, charging defendants Erie County and ECC with employment discrimination based on "race/color, national origin, opposed discrimination/retaliation," in violation of NY HRL and Title VII. (Complaint, Exh. A).  In it, he authorized the NYSDHR to accept the complaint on behalf of the U.S. Equal Opportunity Employment Commission ("EEOC").  On April 14, 2011, the NYSDHR issued a "Determination and Order after Investigation" dismissing his complaint, finding NO PROBABLE CAUSE to believe ECC or Erie County engaged in the unlawful discriminatory practice described.  (NYSDHR Order, Docket No. 65-3). Plaintiff did not appeal this decision, nor did he request a review by the EEOC. Subsequently, on May 10, 2011, the EEOC issued a "Dismissal and Notice of Rights" adopting the findings of the NYSDHR, and advising plaintiff of his right to file a lawsuit under federal law within 90 days of his receipt of the notice.  (Complaint, Exh. B). Plaintiff commenced this action on May 13, 2011 (within the 90–day period), by filing a Complaint in the United States District Court for the Western District of New York (Docket No. 1), seeking injunctive relief and monetary relief for lost wages, lost benefits, and other damages, as well as punitive damages for the Title VII claim, based on the following five causes of action:

> 1. Discrimination on the basis of national origin in violation of Title VII, including disparate treatment, discriminatory termination, discriminatory terms and conditions of employment, and hostile work environment, by Erie County and ECC.

      2. Retaliation in violation of Title VII, including disparate treatment, discriminatory terms and conditions of employment, and hostile work environment, by Erie County and ECC.

      3. Discrimination and harassment in violation of Section 1981 by all defendants, including hostile work environment and discriminating termination.

      4. National origin and race discrimination in violation of the New York Human Rights Law by all defendants.

      5. Retaliation discrimination in violation of the New York Human Rights Law by all defendants.

On July 29, 2013, all Defendants moved for summary judgment on all claims, based on untimeliness, undisputed material facts, and legally insufficient claims. (Docket Nos. 40-66; 67; 68).  Plaintiff filed submissions in opposition on September 30, 2013 (Docket Nos. 74-78), and Defendants filed reply memoranda on October 11, 2013 (Docket Nos. 79; 80; 81-83).  This Court took the motions under advisement without oral argument.

    **B.**    **The Parties**[2]

ECC is a community college organized and existing pursuant to the laws of the State of New York (ECC Stmt., ¶1) and is part of the State University of New York. (Erie County Stmt., ¶3).  Defendant Erie County is the "sponsor" for ECC as required by statute and provides approximately 17% of ECC's budget.  (Erie County Stmt., ¶¶3,4).

Defendant WDC is a not-for-profit with two members, the Mayor of Buffalo and the County Executive. (WDC Stmt., ¶9).  WDC's primary objective is to administer Federal and State Workforce Investment Act funds, and other funds and grants, for employment and training program purposes. (WDC Stmt., ¶8).  WDC receives its

---

2 Where facts stated in Defendants' Statements of Material Facts are supported by testimonial or documentary evidence, and are not addressed or are denied with a conclusory statement by Plaintiff without reference to conflicting testimonial or documentary evidence, the Court finds such facts to be true. See W.D.N.Y. Local Rule 56(a)(2) ("Each numbered paragraph in the moving party's statement of material facts will be deemed admitted for purposes of the motion unless it is specifically controverted by a correspondingly numbered paragraph in the opposing statement."); id. at 56(a)(3) ("Each statement by the movant or opponent pursuant to this Local Rule must be followed by citation to evidence that would be admissible, as required by Fed.R.Civ.P.6(c)(1)(A).").

funding from the New York State Department of Labor, from which it pays approximately thirty employees at the Buffalo and Erie County Training Center ("BETC").  (WDC Stmt., ¶10).  The BETC has no employees of its own, rather it is a location where a variety of services are made available to displaced workers and others seeking employment, and is funded and primarily staffed by WDC.  (WDC Stmt., ¶¶3,4).  At all relevant times, Colleen Cummings, a City of Buffalo employee, was the Director of the BETC and the supervisor of the WDC staff at the BETC.  (WDC Stmt., ¶7 ; ECC Stmt., ¶5).

Plaintiff began teaching basic computer classes at the BETC as a WDC employee in approximately June of 2003.  (WDC Stmt., ¶¶1,2).  During 2006, WDC and ECC entered into a contract for ECC to provide basic computer courses at the BETC and the instructors for those courses.  (WDC Stmt., ¶11).  In conjunction, ECC hired Plaintiff on or about June 1, 2006 as a part-time instructor for ECC's Workforce Development office (ECC Stmt., ¶2), which offers remedial non-credit computer courses at several locations, including ECC North Campus, ECC South Campus, 45 Oak Street, (near ECC City Campus), and at the BETC.  (ECC Stmt., ¶4).  At all relevant times, Carrie Kahn was ECC's Executive Dean of Workforce Development and managed the relationship between ECC and WDC.  (ECC Stmt., ¶8).  Plaintiff avers that while he taught at the WDC as an ECC employee, he was supervised by Cummings and Joseph Sullivan, WDC's manager of Placement and Retention and the Career Resources Center (WDC Stmt., ¶15), and that Jeanette Madoo, another WDC employee, created his schedules, ordered materials, and developed curriculum.  (Plaintiff Erie County Stmt., ¶9).

While assigned to the BETC, Plaintiff was paid by ECC for the hours he taught, but for a period of time, he also earned wages from WDC for his preparation time, in accordance with WDC paying other instructors for the same.  (Plaintiff Dep., pp.22-23, Docket No. 45).    Plaintiff also worked part-time for a different employer teaching computer classes at another downtown location in the afternoons (ECC Stmt., ¶7) and occasionally at the BETC   (See Plaintiff Decl., ¶56).   Plaintiff continued to teach computer classes on a part-time basis at the BETC until October 2, 2008.  (WDC Stmt., ¶12; ECC Stmt., ¶¶2,4).   In November 2008, Plaintiff was assigned to teach non-credit remedial classes at ECC Workforce Development's 45 Oak Street location, where Plaintiff remained an instructor as an ECC employee until at least the date of the parties briefings.  (ECC Stmt., ¶6).  As discussed herein, Plaintiff concedes he is technically an ECC employee, but he disputes that he, in fact, remained employed throughout the relevant time period; first, because he claims he was told he was "terminated" in October of 2008, and second, because his hours have substantially decreased over time. (Plaintiff ECC Stmt., ¶6).

### C.    Events Leading to Plaintiff's Removal from BETC

Plaintiff alleges that in 2008, Sullivan began treating him poorly.  (Plaintiff Decl., ¶28).   Sometime before May 16, Sullivan and Plaintiff had a dispute about Plaintiff's treatment of a student who was tardy for his class.  (WDC Stmt., ¶15; Plaintiff WDC Stmt., ¶15).  Plaintiff claims that Sullivan became hostile with him, and stated: "you all of a sudden Mr. By the Rule," and then threatened that "I can be on your back too. If you come in two minutes late or leave two minutes early, I can be Mr. By the Rule too."

(Plaintiff Dep., p.37).[3]   Sometime after that, on or about May 16, 2008, Plaintiff discovered a student cheating on an exam, and had another disagreement with Sullivan about whether the student should be allowed to retake it.  (WDC Stmt., ¶16).  Plaintiff claims that Sullivan "escalated the situation" (Kao Decl., ¶37); according to Plaintiff,

> "He say you're nothing like me.  You have no compassion. You have no understanding about this country.  He say this country is very dark.  This place is very dark. He say a lot of people don't have a job like you.  He say if you want your perfect dream class and perfect student, go to work for UB, or go back to China, or go where – somewhere else.  He say this place is too dark for you."

(WDC Stmt., ¶17).

Plaintiff asserts that he found this comment to be racist and demeaning.  (WDC Stmt., ¶18; Plaintiff WDC Stmt., ¶18).  Plaintiff states that he complained the following week to his colleague Madoo and BETC Director Cummings about the remark (Plaintiff Decl., ¶¶40-42), but that he did not know of a formal complaint procedure at BETC. (WDC Stmt., ¶18).  According to Plaintiff, Sullivan "was never friendly" to him and was on occasion "mean and nasty" (Plaintiff Dep., pp. 49-50).   After this incident and Plaintiff's alleged complaints, Plaintiff claims Sullivan began disrespecting him publicly (WDC Stmt., ¶19), including during the following incidents:

- "There was an instant that I was introducing Joe to my students 'cause we were having graduation celebration. And I say hello, everyone. This is Joe Sullivan, my supervisor. He just kind of gave us – gave me a dirty look and left the room. And my student was asking, what was that about." (Kao Dep., p.48).
- "During the meetings I had with WDC staff who made my schedule and set up my classes at the BETC location, Mr. Sullivan would put me down no matter what I said or what idea I offered." (Plaintiff Decl., ¶48).
- Sometime between May and October, Sullivan told students not to sign up for Plaintiff's classes. (WDC Stmt., ¶19).

---

3 There is some discrepancy in the record whether this comment was made in relation to the disagreement about the late student or during the May 16th incident regarding the student exam retake.

Finally, on October 2, 2008, a BETC student complained to Sullivan that Plaintiff told offensive jokes, sexual in nature, to the class during her four-day course.  (WDC Stmt., ¶¶21-22).  The student reported that one of the jokes mentioned the word "pussy" and another was about a man with two assholes.[4] (WDC Stmt., ¶22).  The student found the jokes "unacceptable" and felt that they were "sexually motivated and should not be in the class rooms." (Van Vessem Decl., Exh. H, Docket No. 63).  Sullivan relayed the student complaint to Cummings. (WDC Stmt., ¶23).  Sullivan spoke with several other students in the class, and although they were not personally offended by the language, they confirmed that Plaintiff told the jokes. (WDC Stmt., ¶24).  Sullivan discussed his findings with Cummings, and they decided that Plaintiff should no longer teach at the BETC. (WDC Stmt. ¶25).  Cummings notified ECC of the student complaint and requested that ECC provide a replacement instructor.  (Erie County Stmt., ¶10).

In his deposition, Plaintiff states his recollection of the incident that led to his removal from the BETC:

> "As an icebreaker that morning, we were kind of joking around.  My student ask a question, say 'Mr. Li, is it true? They say Chinese people eat cats and dogs.'  And I just kind of out of the blue, I say, 'to answer your question, you know, I have a joke for you.'  So I say, 'little Johnny went to school, and the teacher was asking little Johnny, why do you bring your cats to school?  Little Johnny say, because I overheard my parents say they were going to eat the pussycat.'  That was the joke."

(Plaintiff Dep., pp.55-56).

Plaintiff adamantly asserts that he did not understand the joke to be sexual in nature, and that he did not know of the double meaning of the word because of his

---

4 Text of the note: "Jokes are being made in Li-Wei Kao [sic] class makes which are unacceptable jokes to me, I don't know about others. 10/1/08 (1) Yesterday the joke was about panties pussy (mentioned in the joke). 9/30/08 The joke on this day was about panties 10/2/08 Today his joke just went a little to [sic] far because it is taking up my time trying to grasp and learn what I can in a short period of time. The joke was about a man who had gotten burned up and the only way to be identified by his friends was by the 2 assholes he had.  I feel the jokes are sexually motivated and shouldn't be in the class rooms. 10/2/08 Mrs. Blackburn Leona Blackburn"

"limited background with the English language." (Plaintiff Decl. ¶73). Rather, he proclaims the joke had to do with "'Chinese people' eating cats." (See, e.g., Plaintiff WDC Stmt., ¶21; Plaintiff Decl., ¶¶59-61). Plaintiff does not recall, nor does he deny making the other jokes mentioned in the student note. (Plaintiff Dep., p.67). Nobody at WDC or ECC asked Plaintiff about the incident at that time. (Plaintiff Decl., ¶64). Plaintiff contends that he was removed from the BETC, not because of the jokes, but because of Sullivan's actions and because of retaliation by Sullivan and Cummings for his earlier complaints about Sullivan's racially motivated comments. (Plaintiff Decl., ¶54). Plaintiff did not file a complaint against WDC with either the EEOC or the NY DHR. (WDC Stmt., ¶26).

### D. Plaintiff's Reassignment to 45 Oak Street

On October 2, 2008, Eileen Flaherty, ECC's Director of Human Resources, contacted Plaintiff to inform him that he would no longer be teaching at the BETC. (Erie County Stmt., ¶11). Plaintiff asserts that Flaherty told him: "your position with ECC has been terminated based on the recommendation of Buffalo Employment Training Center", and "do not report to work on Monday. We have already found a replacement for you." (Plaintiff Dep., p.29). Plaintiff also alleges that Flaherty told him "we know you are a good instructor, but what you say in class was unacceptable" and also "you have the right to obtain union rep[resentation]," and then gave him the phone number of a representative for the Faculty Federation of Erie Community College (FFECC). (Plaintiff Dep., p.30). Plaintiff understood the conversation with Flaherty to mean ECC terminated his employment. (Plaintiff Erie County Stmt., ¶11). Flaherty denies using the word "terminated" in the conversation, and ECC maintains that Kao was never terminated. (Flaherty Dep., p. 22-23; Willis Decl., ¶¶8-9; see Kahn Decl., ¶¶16-17).

Following the phone call with Flaherty, Plaintiff attempted to contact Cummings who did not respond. (Plaintiff Decl., ¶21). Plaintiff also spoke with a member of the FFECC, but because he was not a member, he retained his own attorney. (Plaintiff Dep., p.71). On October 15, 2008, Plaintiff filed an electronic complaint with the Erie County Equal Employment Opportunity Office, regarding the incidents at the BETC. (Erie County Stmt., ¶12). The Erie County EEO contacted Darley Willis, ECC's Director of Equity and Diversity, to investigate the complaint. (Erie County Stmt., ¶13). Concurrently, Plaintiff contacted the NYSDHR about the WDC events, and a representative drafted a complaint for him, which he never filed. (Plaintiff Decl., ¶97).

In a letter from Flaherty dated November 6, 2008, Plaintiff was requested to meet with ECC representatives, including Carrie Kahn, The Executive Dean of Workforce Development, and Flaherty, regarding the "reassignment of [his] classes through Workforce Development." (Van Vessem Decl., Exh. J, Docket No. 64). Plaintiff and ECC representatives met on November 12, 2008. (ECC Stmt., ¶13). Although Plaintiff requested that his attorney attend the meeting, ECC declined to allow it. (Complaint, ¶13). Plaintiff accepted an offer to work at the ECC Workforce Development office's 45 Oak Street location, where he would teach non-credit remedial computer classes. (ECC Stmt., ¶15; Plaintiff Decl., ¶107). Plaintiff disputes that ECC offered him any other locations (Plaintiff Decl., ¶108), but the 45 Oak Street location and certain schedule changes accommodated Plaintiff's need to travel to another job in the afternoons and his desired number of potential work hours. (ECC Stmt., ¶¶13-20). At that meeting, Plaintiff also agreed to attend Employee Assistance Program counseling because of the incident with the jokes; however, he never attended. (ECC Stmt., ¶¶21,22). Plaintiff

began teaching classes at 45 Oak Street shortly thereafter, and did not pursue any legal action at that time.

### E.    ECC Workforce Development Policies and 45 Oak Street Location

Approximately one year later, in October 2009, Plaintiff alleges that he "began complaining" to Kahn about his classes at 45 Oak Street being cancelled due to low enrollment. (Plaintiff Decl., ¶147). After discovering an ECC faculty member was enrolled in Plaintiff's class, Kahn informed Plaintiff that ECC students and faculty were not permitted to take non-credit remedial computer classes. (Plaintiff Decl., ¶¶132,142). Then, in 2010, certain ECC Workforce Development policy changes related to student enrollment took effect. On December 30, 2009, Maureen Passmore, Kahn's assistant, sent an email to ECC Workforce Development instructors, informing them that because of state budget changes, ECC increased the minimum number of students for a course to run from eight to ten, effective in January 2010. (Erie County Stmt., ¶18). It is undisputed that classes at the BETC would be unaffected by this change because the BETC receives separate, additional funding to reimburse ECC if the "break even" enrollment point was not met. (Kahn Decl., ¶¶38-40) On May 25, 2010, Passmore informed ECC Workforce Development instructors that students would be limited to enrolling in the non-credit remedial computer courses a maximum of two times per topic, effective on June 1, 2010. (Van Vessem Decl., Exh. W, Docket No. 65-8). At approximately this time, Plaintiff claims he complained about certain circumstances specific to the 45 Oak Street location, including lack of free parking, minimal foot traffic for potential students, and being required to ask an 82-year-old student to stop attending his classes. (Plaintiff Decl., ¶151). He met with Kahn and Passmore on June 1, 2010 to discuss the policies, as well as potential marketing and recruiting strategies

to keep his courses from being cancelled for low enrollment. (Plaintiff Decl., ¶151). Plaintiff also emailed Kahn about the site-specific issues on June 17, 2010. (Plaintiff Decl., Exh. 23) Plaintiff filed his NYSDHR Complaint on July 19, 2010, "once it became clear" that the ECC policies were not going to change and "nothing was going to be done to make [his] position like it was at the BETC location." (Plaintiff Decl., ¶152).

### III. DISCUSSION AND ANALYSIS

#### A.    Summary Judgment Standard

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

In deciding a motion for summary judgment, the evidence and the inferences drawn from the evidence must be "viewed in the light most favorable to the party opposing the motion." Addickes v. S.H. Kress and Co., 398 U.S. 144, 158-59, 90 S.Ct.1598, 1609, 26 L.Ed.2d 142 (1970). "Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991). The function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

A "mere scintilla of evidence" in favor of the nonmoving party, however, will not defeat summary judgment. Anderson, 477 U.S. at 252. A nonmoving party must do more than cast a "metaphysical doubt" as to the material facts; it must "offer some hard

evidence showing that its version of the events is not wholly fanciful." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); D'Amico v. City of N.Y., 132 F.3d 145, 149 (2d Cir.1998). Rather, he "must set forth specific facts showing that there is a genuine issue for trial." See Anderson, 477 U.S. at 250 (quoting former Fed.R.Civ.P. 56(e)(2)). That is, there must be evidence from which the jury could reasonably find for the nonmoving party. Anderson, 477 U.S. at 252. Thus, summary judgment is proper "if the evidence presented by the nonmoving party is merely colorable, or is not significantly probative, or if it is based purely on conjecture or surmise." Savino v. City of New York, 331 F.3d 63, 71 (2d Cir. 2003) (internal citations and quotations omitted).

In the context of employment discrimination cases, the Second Circuit has explicitly cautioned district courts to use extra care when deciding whether to grant summary judgment because "the ultimate issue to be resolved in such cases is the employer's intent, an issue not particularly suited to summary adjudication." Eastmer v. Williamsville Cent. Sch. Dist., 977 F. Supp. 207, 212 (W.D.N.Y. 1997) (quoting Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994)); Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008).

Nonetheless, "[t]he summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985). Indeed, the Second Circuit has noted that "the salutary purposes of summary judgment — avoiding protracted, expensive and harassing trials — apply no less to discrimination cases than to commercial or other areas of litigation." Meiri, 759 F.2d at 998.

**B.     McDonnell-Douglass Burden Shifting Analysis**

Plaintiff alleges discrimination and retaliation claims pursuant to Title VII, Section 1981, and the NY HRL, which are all reviewed under the familiar burden-shifting approach of McDonnell Douglas, 411 U.S. at 802–04, 93 S.Ct. 1817; Kwan v. Andalex Group LLC, 737 F.3d 834, 843 (2d Cir. 2013) (Title VII and NY HRL claims); Sumner v. U.S. Postal Service, 899 F.2d 203, 208 (2d Cir. 1990) ("the order and allocation of burdens of proof in retaliation cases follow that of general disparate treatment analysis as set forth in McDonnell Douglas"); Carmody v. Village of Rockville Centre, 661 F.Supp.2d 299, 324 (E.D.N.Y. 2009) (Title VII, Section 1981, and NY HRL discrimination and retaliation claims).  First, Plaintiff must make out a *prima facie* case of discrimination or retaliation.  "The burden of establishing a *prima facie* case of disparate treatment is not onerous."  Texas Dep't of Comt'y Affairs v. Burdine, 450 U.S. 248, 253, 101 S. Ct. 1089, 1094, 67 L. Ed.2d 207 (1981); see also Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000) (characterizing burden as "minimal").

Once a plaintiff meets this initial burden and establishes a *prima facie* case, a rebuttable presumption of discrimination or retaliation arises, and the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment action.  Burdine, 450 U.S. at 254.  The defendant's burden at this step has been characterized as "light."  Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 52 (2d Cir.1998).  "The employer need not persuade the court that it was motivated by the reason it provides; rather it must simply articulate an explanation that, if true, would connote lawful behavior."  Greenway, 143 F.3d at 52.

If the defendant succeeds in making this showing, "the presumption of discrimination arising with the establishment of the *prima facie* case drops from the

picture." Weinstock v. Columbia University, 224 F.3d 33, 42 (2d Cir. 2000) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11, 113 S. Ct. 2742, 125 L. Ed.2d 407 (1993)). The burden then returns to the plaintiff to prove that "the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination." Weinstock v. Columbia University, 224 F.3d at 42.

To defeat defendants' motions for summary judgment, Plaintiff must produce "not simply 'some' evidence, but 'sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the employer were false," and that more likely than not discrimination or retaliation was the real reason for the adverse employment action. Van Zant, 80 F.3d 708, 714 (2d Cir. 1996); Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986) (summary judgment appropriate where movant shows "that there is an absence of evidence to support the nonmoving party's case").

### C.    Attributable to the Employer

Essential to an employment discrimination case is that the challenged acts are attributable to a plaintiff's employer. See Gulino v. New York State Educ. Dep't, 460 F.3d 361, 370 (2d Cir. 2006) ("the existence of an employer-employee relationship is a primary element of Title VII claims"). In certain instances, "an employee, formally employed by one entity, who has been assigned to work in circumstances that justify the conclusion that the employee is at the same time constructively employed by another entity, may impose liability for violations of employment law on the constructive employer, on the theory that this other entity is the employee's joint employer." Arculeo v. On-Site Sales & Marketing, LLC, 425 F.3d 193, 198 (2d Cir. 2005), citing Clinton's Ditch Co-op Co., Inc. v. N.L.R.B., 778 F.2d 132, 137 (2d Cir. 1985).

It is undisputed that ECC is, in fact, Plaintiff's employer.  On the other hand, Plaintiff alleges that while he worked at the BETC as an ECC employee, Cummings and Sullivan continued to supervise him; Madoo created his schedules, ordered materials, and developed curriculum; and for a period of time, he earned wages from WDC for his preparation time.  Thus, Plaintiff has provided sufficient evidence for a rational fact finder to conclude that WDC was his "joint employer." The Court will analyze Plaintiff's Section 1981 claims on that assumption.  See Arculeo, 425 F.3d at 198; see also St. Jean v. Orient–Express Hotels Inc., 963 F.Supp.2d 301, 308 (S.D.N.Y. 2013) (considering "commonality of hiring, firing, discipline, pay, insurance, records, and supervision" relevant factors in joint employer analysis); Barbosa v. Continuum Health Partners, Inc., 716 F.Supp.2d 210, 216-217 (S.D.N.Y. 2010) (applying "joint employer" doctrine in Section 1981 and NY HRL claims).

In addition, Plaintiff attempts to impose Title VII liability on Erie County for "not investigating Plaintiff's complaint and being complicit with ECC's retaliation"; however, Erie County was never Plaintiff's employer, as he was hired by ECC (Erie County Stmt., ¶1; Van Vessem Decl., Exh. F, Docket. No. 62-1) and received no compensation from Erie County.  (Erie County Stmt., ¶16).  Gulino, 460 F.3d at 372 (where plaintiff was neither "hired" by nor received financial benefit from the putative employer, no "plausible employment relationship" exists).  The Court will not address Plaintiff's arguments that ECC and Erie County should be considered a "single employer" under Arculeo because, for the reasons discussed herein, all claims pertinent to Erie County are dismissed on the merits.

D.      **Timeliness of Claims**[5]

With respect to Plaintiff's Title VII claims, "where a plaintiff fails to file an administrative charge with a state agency within 300 days of the complained-of-actions (or with the EEOC within 180 days of the complained-of-actions), the plaintiff is barred from thereafter initiating a lawsuit in federal court based upon those actions." Eaton v. Wayne Central School Dist., 25 F.Supp.3d 370, 373 (W.D.N.Y. 2014), citing 42 U.S.C. § 2000e–5; Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 712-13 (2d Cir. 1996). This provision "is analogous to a statute of limitations.  Thus, as a general rule, only events that occurred during the 300–day period prior to the filing of the administrative complaint are actionable under Title VII, unless the period has somehow been equitably tolled or extended." Patterson v. Xerox Corp., 732 F.Supp.2d 181, 188 (W.D.N.Y. 2010).  Furthermore, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) (noting that "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify.").  "A charge alleging a hostile work environment claim, however, will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." Id. at 122.  Timeliness of a plaintiff's claim is measured from the date he had notice of the alleged discriminatory action. Van Zant, 80 F.3d at 713.

---

5  Although not at issue here, a four year statute of limitations applies to Section 1981 claims.  28 U.S.C. § 1658; Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 124 S.Ct. 1836, 158 L.Ed.2d 645 (2004); see Banks-Holliday v. American Axle & Mfg., Inc., 2005 WL 189724 *1 (W.D.N.Y. 2005) (stating that "The Supreme Court noted [in Jones] that, prior to the 1991 amendments to the Civil Rights Act of 1866, claims of hostile work environment and racial discrimination relating to the conditions of employment were not actionable under 42 U.S.C. § 1981.  In other words, the petitioners' § 1981 claims were not available to them until after the federal catchall statute of limitations was enacted.  Because the petitioners' claims were cognizable only under a statute enacted after December 1, 1990- i.e., the Civil Rights Act of 1991-they are governed by § 1658's four-year statute of limitations.")

Plaintiff filed his administrative complaint with the NYSDHR on July 19, 2010. (Complaint, ¶4; Exh. A).   Therefore, only incidents that occurred within 300 days of Plaintiff's filing his administrative complaint – in this case, on or after September 22, 2009 – are actionable under Title VII.  Morgan, 536 U.S. at 113-114.  Plaintiff's alleged "abrupt termination" from BETC and alleged termination from ECC on October 2, 2008, and his "retaliatory rehiring" by ECC on November 12, 2008, are discrete events that are time-barred under Title VII.  Morgan, 536 U.S. at 113-114.  Likewise, any of the alleged discriminatory or retaliatory actions that occurred while Plaintiff worked at the BETC location are discrete actions and are untimely as a basis for Plaintiff's Title VII claims.  Id.  ("Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'").  Even if the court were to assume the "harassment" by Sullivan constituted a hostile work environment at WDC, it cannot reasonably be found to have carried over to Plaintiff's new location at the hands of unrelated individuals to be included in his Title VII claims against ECC.  See McGullam v. Cedar Graphics, Inc., 609 F.3d 70, 78 (2d Cir. 2010) (finding allegedly harassing conduct in one department insufficiently related to conduct in new department after transfer).

### 1.      Equitable Estoppel

Plaintiff puts forth several theories to carry over the 2008 events for his Title VII claim.   He asserts that ECC should be equitably estopped from asserting the untimeliness defense for his "retaliatory" rehiring because Kahn "knowingly misled" Plaintiff into accepting the 45 Oak Street position to avoid a lawsuit.  (Opposition, pp.3-4).  "[E]quitable estoppel is invoked in cases where the plaintiff knew of the existence of his cause of action but the defendant's conduct caused him to delay in bringing his

lawsuit." Cerbone v. Int'l Ladies' Garment Workers' Union, 768 F.2d 45, 49-50 (2d. Cir 1985) (giving examples where defendant misrepresented the length of the limitations period or in some way lulled the plaintiff into believing it was not necessary to commence litigation). Where an employee reasonably relies on "a representation on an offer of a job assignment and benefits substantially equivalent to [his] former position," and "delays in filing his EEOC charge until after the limitations period has expired, the employer may be estopped to assert the limitations bar" in a later lawsuit. Id. (referring to settlement negotiations in an ADEA case). Nevertheless, equitable doctrines "are to be applied sparingly." Morgan, 536 U.S. at 113-114; Baldwin County Welcome Center v. Brown, 466 U.S. 147, 152, 104 S.Ct. 1723, 80 L.Ed.2d 196 (1984) (per curiam) ("Procedural requirements established by Congress for gaining access to the federal courts are not to be disregarded by courts out of a vague sympathy for particular litigants").

Plaintiff alleges that Kahn knew he would not be able to succeed at his new location and misled him into accepting the position at 45 Oak Street by telling him it was a better facility than the BETC. (Opposition, p.4). He also argues that Kahn had an obligation to tell him that his classes could be cancelled for low enrollment at 45 Oak Street, unlike at the BETC, and that "she left out that Plaintiff would never be able to recruit enough students to actually run a class there." (Opposition, pp.5-6). It is undisputed, however, that ECC had no ability to reinstate Plaintiff at his old position (Opposition, p. 12), and that ECC offered him an available position that met his scheduling and location needs. (Plaintiff Decl., ¶123). Plaintiff argues that ECC gave him an ultimatum to accept the 45 Oak Street position, because if he did not accept it,

he would be treated as resigning (Plaintiff Dec., ¶108); however, nowhere does Plaintiff demonstrate that this opportunity was presented in exchange for his agreement not to file a timely charge. Rather, he states that "ECC rehired me before my attorney could draft and file a proper SDHR complaint." (Plaintiff Decl., ¶105).

Further, Plaintiff's claim that he only "realized" in October 2009 that he was placed at the undesirable 45 Oak Street location as a result of retaliation, the record supports neither the discriminatory substance of his complaints, discussed below, nor the "realization" of his injury. ECC's Summary Paycheck History Reports demonstrate that he was still regularly teaching classes and getting paid at that time, and, consequently, would have had no injury about which to complain. (Kahn Reply Decl., Exh. A). Second, course listing and cancellation records demonstrate that during the 2009-2010 school year, leading to his NYSDHR complaint, he had one class cancelled at the Oak Street location. (Kahn Reply Decl., Exh. B). During that school year, another instructor at 45 Oak Street had multiple cancellations, and instructors at another ECC Workforce Development site also had classes cancelled. (Kahn Reply Decl., Exh. B). No reasonable jury could believe that ECC misled Plaintiff into accepting the 45 Oak Street position 6 weeks after his removal from the BETC in order to trick him into missing the subsequent 300-day filing deadline for his alleged "termination." The court finds insufficient evidence to demonstrate circumstances warranting the application of equitable estoppel.

## 2.   Continuing Violation

In the alternative, Plaintiff asserts that his rehiring was the beginning of a continuing violation – "a retaliatory and misleading scheme to put Plaintiff in a position where he would not have to be paid while also avoiding a threatened lawsuit."

(Opposition, p. 7).  Under this theory, "if a Title VII plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone."  Lambert v. Genesee Hospital, 10 F.3d 46, 53 (2d Cir. 1993), cert. denied, 511 U.S. 1052, 114 S.Ct. 1612, 128 L.Ed.2d 339 (citations omitted).  On the contrary, serial violations or "multiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation." Lambert, 10 F.3d at 53; Morgan 536 U.S. 114 ("While Morgan alleged that he suffered from numerous discriminatory and retaliatory acts from the date that he was hired through … the date that he was fired, only incidents that took place within the timely filing period are actionable.").  Furthermore, "a continuing violation cannot be established merely because the claimant continues to feel the effects of a time-barred discriminatory act … [n]or can an otherwise barred claim be rendered timely by the mere continuation of the claimant's employment."  Harris v. City of New York, 186 F.3d 243, 250 (2d. Cir. 1999).

Here, Plaintiff alleges a series of discrete acts, including Sullivan's allegedly racially hostile remark, Plaintiff's abrupt removal from the BETC, his alleged "termination" from ECC, his "retaliatory rehiring," and then at least one year later, the enforcement or enactment of independent policies by ECC.  Even assuming any of these amounted to an unlawful adverse employment event, they each amount to a separate practice under the standard set forth in Morgan, and cannot be considered part of a "discriminatory policy or mechanism." Lambert, 10 F.3d at 53.

Plaintiff attempts to connect a series of events in which he believes he was treated poorly, first by WDC and then ECC. He claims that these incidents occurred because of his race and because of his complaints, and that such conduct, together with his timely claims, show a pattern of discrimination. However, Plaintiff's evidence would not permit a reasonable fact finder to conclude that the time barred events were reasonably related to any timely event, or, as discussed below, that any timely event was the result of discrimination or retaliation. The Court finds that neither of these theories saves Plaintiff's time-barred claims.

### E. Title VII National Origin Discrimination

To establish a *prima facie* case of discrimination under Title VII, Plaintiff must demonstrate that (1) he is a member of a protected class, (2) he was qualified for his position, (3) he suffered an adverse employment action, and (4) the circumstances of the adverse action give rise to an inference of discriminatory intent. Holcomb, 521 F.3d at 138. Although Plaintiff's burden is minimal, he cannot maintain the Title VII national origin discrimination claim against ECC.

Nothing in the record supports an allegation that any ECC representative discriminated against Plaintiff based on his national origin. Plaintiff's claim against Erie County rests entirely on ECC's actions. Conclusively, Plaintiff conceded in his deposition that "being treated differently" by ECC has "nothing to do with my national origin; it has to do with retaliation." (Kao Dep., p.142). The court finds that Plaintiff's admission alone negates Plaintiff's *prima facie* case, given that from Plaintiff's own perspective there is no inference of discriminatory intent based on his national origin. Moreover, in its Motion, ECC asserts that Plaintiff's admission is dispositive on this issue. (ECC Memorandum, p.11). Plaintiff offers no response to ECC's argument in his

Opposition.  Thus, the Court also deems the Title VII national origin discrimination claim abandoned.  See Taylor v. City of New York, 269, F. Supp. 2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.").  Therefore, Claim 1, Title VII Discrimination based on national origin, is dismissed.

### F.    Title VII Retaliation

Plaintiff's claim that ECC adopted or enforced certain policies in retaliation against him must also be dismissed.  The policies and actions include: (i) prohibiting ECC academic students and ECC faculty and staff from taking non-credit remedial computer classes (Plaintiff Decl., ¶¶131,132); (ii) increasing the minimum number of students from eight to ten, beginning in January 2010 (Plaintiff Decl., ¶129); (iii) limiting the number of times a student could take a course to two, beginning in June 2010 (Plaintiff Decl., ¶126); (iv) prohibiting an elderly student from taking his classes (Plaintiff Decl., ¶142); (v) lack of free parking for Plaintiff or students at 45 Oak Street (Plaintiff Decl., ¶134); and (vi) insufficient assistance in marketing his classes (Plaintiff Decl., ¶143).  He asserts that ECC was not specifically required to adopt the new policies or that they were selectively applied to him, causing his classes to be cancelled more frequently than those of other non-credit remedial computer instructors who had not complained of retaliation.  (See, e.g., Plaintiff Decl., ¶¶128,131,132).

### 1.    Plaintiff's *Prima Facie* Case

To establish a *prima facie* case of retaliation, Plaintiff must show 1) that he participated in an activity protected by Title VII; 2) ECC knew of the protected activity; 3) that he suffered "an adverse employment action"; and 4) that a causal connection exists

between the protected activity and the adverse employment action.  Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005).   The Second Circuit permits finding no inference of causation "(1) if the allegedly retaliatory discharge took place at a temporal remove from the protected activity; or (2) if there was an intervening causal event that occurred between the protected activity and the allegedly [adverse action]."  Yarde v. Good Samaritan Hosp., 360 F.Supp.2d 552, 562  (S.D.N.Y. 2005).   At this stage, "the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive."  Id.

### a.   Plaintiff's 2008 Complaints

Plaintiff argues that his initial protected activity was one of the following: (1) the October 15, 2008 Erie County EEO discrimination complaint, which Erie County forwarded to ECC (Opposition, p. 22), or (2) his unfiled October 2008 draft NYSDHR Complaint (Opposition, p.5).   In each of these complaints, Plaintiff arguably made charges of discrimination and retaliation in violation of Title VII.   Additionally, ECC's Willis received the Erie County EEO complaint, and the record demonstrates that ECC knew Plaintiff hired a lawyer at that time.  (Plaintiff Decl., ¶98).  Therefore, for the sake of Plaintiff's prima facie case, the Court accepts that Plaintiff has satisfied the first and second factors regarding these alleged protected activities.   Nonetheless, even assuming any of ECC's 2009-2010 actions could be considered adverse employment events, the record demonstrates that ECC either enforced existing policies or implemented its policy changes more than a year after Plaintiff made the 2008 charges, thereby defeating any causal connection based on temporal proximity between

Plaintiff's complaints and ECC's actions.  Yarde, 360 F.Supp.2d at 562 (lengthy time period between protected activity and alleged adverse employment action "weighs against a finding of retaliation"); Douglas v. Eastman Kodak, 373 F.Supp.2d 218, 226 (W.D.N.Y. 2005) (ten month period too long), citing Fields v. New York State Office of Mental Retardation & Developmental Disabilities, 88 F.Supp.2d 4, 8 (N.D.N.Y. 2000) (nine months "does not create or permit an inference of discriminatory animus") and Duviella v. Counseling Serv. of Eastern Dist. of New York, 2001 WL 1776158, *19 (E.D.N.Y.), aff'd, 52 Fed.Appx. 152 (2d Cir. 2002) (eight months insufficient to establish temporal proximity).  Accordingly, neither of these complaints can reasonably support an inference of retaliation with respect to any timely alleged act.  See Yarde, 360 F.Supp.2d at 562.

### b.    Plaintiff's 2009 Complaints

Plaintiff also argues that ECC retaliated against him for complaints he allegedly made to Kahn in approximately October of 2009, when he claims to have learned of his injury from being placed at the 45 Oak Street location, and "realized that [his] classes would rarely, if ever, be able to run."  (Opposition, p.5; Plaintiff Decl., ¶147).  As a general matter, "[s]tatements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment."  Bickerstaff v. Vassar Coll., 196 F.3d 435, 452 (2d Cir.1999) (citations omitted).  More specifically, with respect to Title VII, "implicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII."  Galdieri–Ambrosini v. National Realty &

<u>Development Corp.</u>, 136 F.3d 276, 292; 42 U.S.C. § 2000e–3(a) (prohibits employer from taking adverse action against an employee who "has opposed any practice made an unlawful employment practice [under Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]);.

Plaintiff fails to satisfy either the first or second prongs of the *prima facie* case. Plaintiff's evidence consists of general complaints to ECC about the circumstances at his location: "Ms. Kahn admitted that sometime after I was rehired to work at the 45 Oak Street location in November 2008 I began "continually" complaining about the location" (Plaintiff Decl., ¶146); "My complaints about these retaliatory actions began once I realized that my classes would rarely, if ever, be able to run. This was sometime in October 2009, which Ms. Kahn admitted to hearing" (Plaintiff Decl., ¶147); "Even after I began raising concerns about the rules that affected my courses and ability to fill them …" (Plaintiff Decl., ¶148); "As a result of these rule changes for just me I had a meeting with Ms. Kahn and Ms. Passmore on June 1, 2010" (Plaintiff Decl., ¶151); "My second SDHR complaint was filed on July 16, 2010 and came on the heels of my complaint and meeting with Ms. Kahn and Ms. Passmore once it became clear that the changes that did not permit ECC students to take my courses, required a minimum of ten students, did not permit students to repeat my course more than once, and did not allow instructors to take my course were not going to change and nothing was going to be done to make my position like it was at the BETC location" (Plaintiff Decl., ¶152). This final allegation is telling: Plaintiff may well have "continually complained," however, the

essence of his complaints was that he preferred the BETC position and that his new position simply was not the same.

Moreover, the only evidence in the record that supports Plaintiff's complaints about any of the above circumstances or policies is contained in emails from at least six months after his alleged 2009 complaints, dated: June 1, 2010, acknowledging policy changes and raising marketing issues; June 17, 2010, regarding marketing issues; and October 6, 2010, in response to the investigation of his 2010 NYSDHR filing.  None of these reasonably support the existence of or protected quality of his alleged 2009 complaints.  (Plaintiff Decl., Exhs. 19,23).  His vague and unsupported allegations do not permit a reasonable finding that ECC was aware that he was complaining about any practice prohibited by Title VII.  Galdieri–Ambrosini, 136 F.3d at 292.

### 2.    ECC's Legitimate Non-Discriminatory Reasons

Even assuming Plaintiff established a *prima facie* case of retaliation, ECC offers legitimate business reasons for its policies.  ECC does not dispute that Plaintiff's classes were cancelled more frequently during late 2010 and thereafter, but attributes the change to several neutral factors (Kahn Decl., ¶55).  The minimum enrollment number for all remedial non-credit computer classes was increased from eight to ten, in response to New York State reducing the per student reimbursement rate.  (Kahn Decl., ¶¶38-44).  Following an audit of the non-credit remedial programs and recommendations by State University of New York Office of Community Colleges, students could no longer take the same class more than two times.  (Kahn Decl., ¶¶45-48).  Plaintiff became aware that faculty, staff and students were not permitted to take his classes, pursuant to a New York State non-credit remedial regulation, NYCRR 602.5, governing these programs that are specifically intended for unemployed or

underemployed workers lacking basic computer skills.   (Kahn Decl., ¶¶30-36).

Additionally, Plaintiff's classes at 45 Oak Street had an earlier start time compared to

other non-credit remedial computer instructors, which ECC allowed to accommodate his

afternoon job with the Buffalo Public Schools.  (Kahn Decl., ¶55).

### 3.    Plaintiff's Evidence to Rebut ECC's Legitimate Reasons

Plaintiff attempts to discredit ECC's proffered reasons with the arguments that

nothing in the SUNY audit or state regulations compelled ECC to set the minimum

number of students to ten, or to prohibit students from registering for a class more than

two times (Plaintiff Decl., ¶126); or that ECC only applied the policies to him (Plaintiff

Decl., ¶¶131,132,137,142).    Plaintiff fails to produce "any evidence, other than

conclusory statements unsupported by the record, to rebut the legitimate,

nondiscriminatory reasons offered by [ECC], let alone evidence that could reasonably

support a verdict in [his] favor," thereby warranting dismissal on summary judgment.

Faris v Instructional Systems, Inc., 259 F.3d 91 (2d Cir. 2001).  The record is simply

devoid of evidence that ECC was motivated by retaliatory intent.  Accordingly, Plaintiff's

Title VII Retaliation claim is dismissed.

### G.    Title VII Hostile Work Environment

Finally, although not in a distinct claim, Plaintiff asserts that ECC also subjected

him to a hostile work environment.  (Complaint, ¶¶26,32).  He alleges that the hostile

work environment carried over from the BETC location when he was moved to the Oak

Street location, this time in the form of facing enrollment challenges.  (Complaint, ¶¶14-

15).  This claim must also fail.  "A court's task is to determine whether the acts about

which an employee complains are part of the same actionable hostile work environment

practice, and if so, whether any act falls within the statutory time period." Morgan, 536

U.S. at 120.   Even if a hostile work environment existed at the BETC that could be attributed to ECC, it was outside the limitations period for Plaintiff's Title VII claim, and any allegedly harassing conduct that occurred there cannot reasonably be related to the timely acts that occurred after Plaintiff's reassignment to 45 Oak Street.  See McGullam, 609 F.3d at 78 (finding single timely comment "insufficiently related" to earlier harassment when employee had moved to a new department that was different "in material respects").   Nor could any reasonable jury find that ECC's policies constituted a new hostile work environment at 45 Oak Street under the well-established standard.  Id. ("To repeat, a plaintiff seeking to establish a Title VII hostile work environment claim must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'").

### H.    Section 1981 Race Discrimination by WDC

Plaintiff claims that WDC discriminated against him on the basis of his race when it asked for his replacement.   "Section 1981 provides, in pertinent part, that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens . . . ." 42 U.S.C. § 1981(a).   This section thus outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment."  Patterson v. County of Oneida, 375 F.3d 206, 224 (2d Cir. 2004) (citing Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 68-69 (2d Cir. 2000)).   When there is no direct evidence of discrimination, the McDonnell Douglas burden-shifting analysis, discussed above, applies.   See Rose v. Mendon Leasing Co., 969 F.Supp.

865, 867 n.2 (E.D.N.Y. 1997) (Section 1981 claims analyzed under Title VII framework) (citing Taitt v. Chem. Bank, 849 F.2d 775, 777 (2d Cir. 1988)).

### 1.   Plaintiff's *Prima Facie* Case

To establish a *prima facie* case of race discrimination, the plaintiff must set forth evidence that (1) he is a member of a protected class, (2) he was qualified for his position, (3) he suffered an adverse employment action, and (4) the circumstances of the adverse action give rise to an inference of discriminatory intent.   Holcomb, 521 F.3d 138.   Here, Plaintiff is Asian; based on his continued employment for several years and positive teaching evaluations, was qualified for the position; and WDC requested his removal from the BETC.   WDC disputes that Plaintiff's case ends here because its request for a new instructor was not an adverse employment action and because Plaintiff cannot demonstrate discriminatory intent.   (WDC Memorandum, p.11).   Given the minimal burden at this stage and Defendants' proffer of a legitimate, non-discriminatory reason for having Plaintiff removed (discussed below), this Court finds it most expeditious in any event to assume the existence of a *prima facie* case and move to the next stage of the analysis.   See Besht v. Gen. Motors, 327 F.Supp.2d 208, 212-13 (W.D.N.Y. 2004) (citing United States Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983) ("Where the defendant has done everything that would be required of him if the plaintiff had properly made out a *prima facie* case, whether the plaintiff really did so is no longer relevant.")).

### 2.   WDC's Legitimate, Non-Discriminatory Reason

The burden is now on WDC to produce a legitimate, non-discriminatory reason for having Plaintiff removed from the BETC.   See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (noting that the

defendant's burden at the second stage is not one of proof or persuasion, but is more appropriately considered a burden of production.)  "This explanation must be 'clear and specific.'"  Gallo, 22 F.3d at 1226 (quoting Meiri, 759 F.2d at 997).  WDC maintains that Plaintiff's abrupt removal from BETC was in response to the student complaint about the inappropriate joke(s).  (WDC Stmt., ¶¶21-25).  Indeed, Plaintiff does not dispute telling the jokes.  (Plaintiff Decl., ¶¶58-62; Plaintiff Dep., p.67).  This Court finds the jokes and student complaint to be a legitimate, non-discriminatory reason for Plaintiff's removal, therefore, the presumption of discrimination created by Plaintiff's *prima facie* case "drops out of the picture."  St. Mary's, 509 U.S. at 511.

### 3.  Pretext for Intentional Discrimination

The burden now returns to Plaintiff to demonstrate that WDC's non-discriminatory reasons are mere pretext for actual unlawful discrimination.  At this stage, the Court must "examin[e] the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'"  Schnabel v. Abramson, 232 F.3d 83, 90 (2d Cir. 2000) (quoting Reeves, 530 U.S. at 143).  A defendant's proffered non-discriminatory reason, however, "cannot be proved to be a 'pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason."  Olle v. Columbia Univ., 332 F.Supp.2d 599, 617 (S.D.N.Y. 2004) (quoting St Mary's, 509 U.S. at 502).  Unless Plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination, WDC is entitled to summary judgment.  See James v. New York Racing Ass'n, 233 F.3d 149, 154 (2d Cir. 2000).

First, Plaintiff has set forth no evidence from which it could reasonably be concluded that WDC's legitimate, non-discriminatory reason is false.  Plaintiff admits he

told the "pussycat" joke that led to the student complaint, and he does not deny telling the other jokes that the student recounted.  (Plaintiff Dep., p.67).   Although Plaintiff vehemently, and to the disbelief of all other witnesses, maintains that he did not realize the joke he told was sexual in nature, no reasonable jury could find that the joke was in fact about "eating cats."  Plaintiff attempts to create a dispute of material fact because no defendant has put forth admissible evidence to demonstrate that he did not say "pussycat" in the punchline, as he repeatedly asserts.  (Plaintiff Decl., ¶77).   Although Plaintiff's abrupt removal from the BETC for this incident seemed harsh to him, his subjective belief and disagreement with WDC representatives about the propriety or impropriety of the joke is inadequate to create a question of material fact regarding WDC's discriminatory intent and defeat summary judgment.   See, e.g., Kaplan v. Multimedia Entertainment, Inc., 2008 WL 686774 *7 (W.D.N.Y. 2008) (plaintiff's assertion that she did not knowingly violate employer's driving policy as she was unaware that her license was suspended was insufficient to rebut legitimate reason for termination), citing Gurry v. Merck & Co., 2003 WL 1878414, *7 n. 9 (S.D.N.Y. April 14, 2003) (plaintiff's subjective belief that she did not misrepresent her employment history was insufficient to rebut legitimate reason for discharge).

Plaintiff also avers that to "raise a dispute of material fact for trial all [he needs] to show is that WDC did not follow its progressive discipline policy when it fired [him]," suggesting that WDC's "unwarranted deviation allowed Mr. Sullivan to achieve Plaintiff's discriminatory and retaliatory termination."   (Opposition, p.21).   Plaintiff relies on October 2008 emails from Kahn to Cummings, in which Kahn states that she will refer to the Erie County handbook when meeting with Plaintiff.  (Plaintiff Decl., Exh. 28, Docket

No. 75.2).  Nowhere does Kahn indicate that Cummings or WDC staff should have done so, nor does Cummings concede such.  (See Plaintiff Decl., Exh. 28)  To the contrary, the evidence on which Plaintiff relies demonstrates that Kahn and Flaherty would consider which steps, if any, *ECC* would take as described in the Erie County Handbook.  (Plaintiff Decl., Exh. 28).  Ultimately, in response to WDC's request for a new instructor, ECC reassigned Plaintiff to his new position and required that he attend EIP training, which he chose not to do.  (ECC Stmt., ¶¶13,21).  That Cummings or other WDC personnel failed to give him a warning before requesting his removal from the BETC in light of the student complaint, does not negate the proffered legitimate reason for Plaintiff's removal from the BETC.

Furthermore, the circumstances of Plaintiff's termination do not raise an inference of race discrimination.  "Essential to an action under Section 1981 are allegations that the defendants' acts were purposefully discriminatory and racially motivated."  Albert v. Caravano, 851 F.2d 561, 571 (2nd Cir. 1988).  It is undisputed that after receiving the student complaint about the jokes and having Sullivan investigate the incident, Cummings promptly asked for Plaintiff's removal.  (WDC Stmt., ¶25).  WDC maintains that Cummings acted in the interest of the BETC "customers", when she decided that Plaintiff should no longer teach at the BETC.  (WDC Memorandum, pp.3,6).  The record contains the student's handwritten note stating the offensive matter.  (Van Vessem Decl., Exh. H).  Sullivan interviewed several members of the class, and they consistently recounted the joke in issue.  (WDC Stmt., ¶¶23,24).  Cummings also asked Sullivan and Madoo what they would do in the situation, and both agreed Plaintiff's language was inappropriate.  (WDC Stmt., ¶25)

Giving all favorable inferences to Plaintiff's version of the events at the BETC, the only evidence in the record with any putative racial undertones is Sullivan's "this place is too dark" comment during the May 2008 conversation, which occurred four months prior to Plaintiff's "termination." (WDC Stmt. ¶17). This alleged remark is too "remote and oblique" with respect to WDC's decision to remove Plaintiff from the BETC to permit a reasonable jury to find for Plaintiff. Tomassi v. Insignia Fin. Grp., 478 F.3d 111, 115 (2d Cir. 2007) ("the more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative that remark will be"), *abrogated in part on other grounds by* Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009). In addition, Plaintiff offers testimony that Sullivan allegedly made racist remarks to other employees; however, his allegation that a coworker told him Sullivan called her a "witch" and "devil-worshipper" because of her religion is unsupported inadmissible hearsay. (Plaintiff Dep., pp.124-125; Plaintiff Decl., ¶53). See Whidbee, 223 F.3d at 71 ("while second-hand comments may be relevant, a district court deciding a summary judgment motion must be provided with admissible evidence demonstrating the truth of the non-movant's assertions"). Although Madoo recalls "tension" between Sullivan and the other employee, who was African-American, Madoo's testimony does not confirm the alleged statements. (Madoo Dep., p.28). Furthermore, Plaintiff offers no evidence of similarly situated employees who did not suffer discriminatory treatment at WDC. In fact, he highlights that at some point, WDC was paying other non-Asian teachers for their preparation time, but not him; however, after he complained to WDC personnel, he also received wages for preparation time. (Plaintiff Dep., pp.22-23; Plaintiff Decl., Exh. 29, Docket No. 75-2).

Recognizing that reasonable persons could differ regarding the intent or perception of words used in a given situation, this Court finds that no reasonable jury could conclude that the content of Sullivan's "too dark for you" statement gives rise to such a strong inference of racial discrimination as to create a motivating factor in Plaintiff's ultimate removal *for cause* four months later.  The other "acts" by Sullivan which Plaintiff recites are neither substantiated by other admissible evidence nor objectively racially hostile.

Thus, Plaintiff has failed to carry his burden of setting forth evidence from which a reasonable trier of fact could conclude that WDC's legitimate, non-discriminatory reasons for his "termination" from BETC are false, and that WDC actually discriminated against him on account of his race.  See Grillo v. N.Y. City Transit Auth., 291 F.3d 231, 235 (2d Cir.2002) ("Even if [plaintiff's] highly dubious claim that he was unfairly singled out for punishment ... is credited, [plaintiff] has done little more than cite to his alleged mistreatment and ask the court to conclude that it must have been related to his race.  This is not sufficient." (internal quotation omitted)), citing Lizardo v. Denny's, Inc., 270 F.3d 94, 104 (2d Cir.2001).  WDC is therefore entitled to summary judgment on the Section 1981 racial discrimination claim.

## I.     Section 1981 Retaliation Claim against WDC

In a similar vein, Plaintiff alleges a Section 1981 retaliation claim against WDC, asserting that his removal from the BETC was actually in retaliation for the complaints he made about Sullivan and not because of the jokes.  (Plaintiff Decl., ¶¶25-26).

### 1.     Prima Facie Case

To establish a *prima facie* case of retaliation, Plaintiff must show that 1) he participated in an activity protected by Section 1981; 2) WDC knew of the protected

activity; 3) he suffered "an adverse employment action"; and 4) a causal connection exists between the protected activity and the adverse employment action.   Jute, 420 F.3d at 173.   In support of his retaliation claim against WDC, Plaintiff asserts that his complaints to Cummings and Madoo about Sullivan's "too dark for you" remark qualify as protected activity, in part, because he was not aware of a formal complaint procedure at the BETC.   (Opposition, p.25; Plaintiff Decl., ¶47).   Plaintiff assumes, based on Sullivan's allegedly increasing hostility towards him after May 2008, that Cummings told Sullivan of Plaintiff's alleged complaint.   (Plaintiff Decl., ¶48).   Sullivan, however, testified that he did not know about Plaintiff's complaint at the time, and Cummings stated that she did not think there was anything about which to inform Sullivan, or on which to act. (Sullivan Dep., p.50; Cummings Dep., pp.26,31-32).   Thus, a dispute of material fact exists as to whether Plaintiff participated in a protected activity and whether WDC knew of Plaintiff's complaint.   See, e.g., Marcus v. Barilla America NY, Inc., 14 F.Supp.3d 108, 117 (W.D.N.Y. 2014) (plaintiff's complaints must mention incidents amounting to unlawful discrimination to count as protected activity). Therefore, for the sake of the discussion, the court will proceed assuming these two elements have been met.

To establish the fourth factor, a causal connection, Plaintiff must demonstrate that the adverse employment action "occurred in circumstances from which a reasonable jury could infer retaliatory intent."   Parrish v. Sollecito, 258 F. Supp.2d 264, 268 (S.D.N.Y. 2003).   An inference of causation may be defeated "if there was an intervening causal event that occurred between the protected activity and the allegedly retaliatory discharge."   Yarde, 360 F.Supp.2d at 562.   Here, it cannot reasonably be

concluded that Plaintiff's "termination" from the BETC is causally connected to his complaints.   Even allowing that more than four months passed between Plaintiff's complaints about Sullivan and his removal from the BETC, the intervening fact that Plaintiff told the inappropriate jokes about which a student complained justifies WDC's request for his removal, and breaks any causal connection based on temporal proximity. See id. (intervening events and six months between complaint and termination did not permit finding of causal connection).   Consequently, this Court finds that Plaintiff has failed to establish a *prima facie* case of unlawful retaliation.

### 2.      Pretext for Retaliation

Yet Plaintiff maintains that WDC's reliance on the joke is mere pretext for retaliation.   "Where a plaintiff has alleged that an employer's reasons for an adverse employment action are pretextural, all reasonable inferences must be drawn in favor of the plaintiff's showing of pretext."   Steffy v. Ford Motor Co., 2007 WL 895506 *7 (W.D.N.Y. 2007).    Plaintiff stresses that Cummings relied solely on Sullivan's investigation and recommendation in making the decision to "terminate" Plaintiff, as giving rise to an inference of retaliation.   (Plaintiff Decl., ¶¶81-87,89).   Nothing in the record suggests that Sullivan's investigation was not legitimate, that the results were false or biased, or that Cummings was incapable of making an independent determination.   Plaintiff's own testimony and submissions prove that he told the joke and that a student complained.   Additionally, a subsequent independent investigation by ECC's Willis, conducted in connection with Plaintiff's 2010 administrative complaint, supports the results of Sullivan's investigation. (Van Vessem Decl., Exh. P, Docket No. 65-1).   Plaintiff's assertion that Sullivan's animosity towards him grew shortly following his alleged complaint, illustrates tension between the two individuals; however, Sullivan

did not merely seize on a questionable performance evaluation to secure Plaintiff's termination, nor did he make the ultimate decision to replace Plaintiff.  The Court cannot second guess an organization's decision to respond to a student complaint by promptly removing a teacher for making objectively inappropriate jokes.  See Hartley v. Rubio, 785 F.Supp.2d 165, 180 (S.D.N.Y. 2011) (finding teacher's insubordination legitimate reason for termination; stating "employer's decisions are given deference by the court unless they are clearly pretextual").

Thus, for these and the reasons discussed in the discrimination context, Plaintiff has presented insufficient evidence to create a genuine issue of material fact about whether WDC's legitimate, non-discriminatory reasons are false, and to demonstrate retaliation was more likely the reason WDC "terminated" Plaintiff's employment at the BETC.  Consequently, WDC is entitled to summary judgment on Plaintiff's Section 1981 retaliation claim.

**J.      WDC Hostile Work Environment Claims**

Plaintiff also alleges a Section 1981 hostile work environment claim against WDC.      However, this claim also fails because Plaintiff has not proffered adequate evidence to allow a reasonable factfinder to conclude that he was subjected to a hostile work environment.  See Whidbee, 223 F.3d at 75.

To survive a motion for summary judgment, a plaintiff claiming that he was the victim of a hostile work environment must produce evidence from which a reasonable trier of fact could conclude that "the workplace was permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment."  Johnson v. IAC/Interactive Corp., 2 F.Supp.3d 504, 516, quoting Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir.2000).  "The

sufficiency of a hostile work environment claim is subject to both subjective and objective measurement: the plaintiff must demonstrate that [he] personally considered the environment hostile, and that the environment rose to some objective level of hostility." Leibovitz v. New York City Transit Auth., 252 F.3d 179, 188 (2d Cir. 2001)[6]. Isolated and occasional instances of harassment do not ordinarily rise to this level. See Breeden, 532 U.S. at 270–271..  The appropriate test is whether the "harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse...." Torres v. Pisano, 116 F.3d 625, 632 (2d Cir. 1997).

Here, Plaintiff alleges the following five events perpetrated by Sullivan over a period of approximately six months to form the basis of his hostile work environment claim against WDC:

- Sullivan's threatening remark on or before May 16, 2008, either with regard to a late student or the exam retake: "I can be on your back too. If you come in two minutes late or leave two minutes early, I can be Mr. By the Rule too." (Plaintiff Dep., p.37).
- Sullivan's May 16, 2008 statement in the disagreement about allowing a student to retake an exam: "He say you're nothing like me. You have no compassion. You have no understanding about this country. He say this country is very dark. This place is very dark. He say a lot of people don't have a job like you. He say if you want your perfect dream class and perfect student, go to work for UB, or go back to China, or go where – somewhere else. He say this place is too dark for you." (Plaintiff Dep., p.38; WDC Stmt., ¶17).
- Sometime between May and October, "an instant that I was introducing Joe to my students 'cause we were having graduation celebration. And I say hello, everyone. This is Joe Sullivan, my supervisor. He just kind of gave us – gave me a dirty look and left the room. And my student was asking, what was that about." (Plaintiff Dep., p.48)  .

---

6 Courts examine various factors to ascertain whether a work environment is sufficiently hostile or abusive to support hostile work environment under either Title VII or Section 1981.  These factors include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance." Leibovitz, 252 F.3d at 188 (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)); Terry v. Ashcroft, 336 F.3d 128, 147–48 (2d Cir. 2003).

- "During the meetings I had with WDC staff who made my schedule and set up my classes at the BETC location, Mr. Sullivan would put me down no matter what I said or what idea I offered." (Plaintiff Decl., ¶48).
- On another occasion between May and October, Plaintiff alleges that Sullivan told a student not to take his class.  Plaintiff's impression was that Sullivan told the student Plaintiff was just promoting his own class and that the student didn't need to take it for what he wanted to do.  (Plaintiff Dep., pp.51-52)

Giving all favorable inferences to Plaintiff's version of these events, his hostile work environment allegation against WDC must fail as a matter of law.  Based on these incidents, no reasonable jury could find the "workplace was permeated with *discriminatory* intimidation" or that Sullivan's alleged treatment of Plaintiff rose to the level of "harassment sufficiently severe or pervasive to alter the conditions of [Plaintiff's] employment and create an abusive environment" while at the BETC based on racial animus or retaliatory hostility.  See IAC/Interactive Corp., 2 F.Supp.3d at 517 (finding three racially-tinged comments did not constitute the type of "severe or pervasive" treatment that would create an abusive working environment).

"Title VII, we have said, does not set forth a general civility code for the American workplace." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006).  Similarly, under Section 1981, "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." Id.  If anything, the record supports that Sullivan was somewhat abrasive in the workplace, and his attitude was not specifically directed at Plaintiff.  When Sullivan made the "Mr. By the Rule" and "too dark for you" remarks, he was vehemently disagreeing with Plaintiff over a legitimate issue of how to treat a BETC student.  (WDC Memorandum, pp.3-4).  Whether or not his reaction was unreasonably severe, "'[t]he

law does not require an employer to like his employees, or to conduct himself in a mature or professional manner, or unfortunately, even to behave reasonably and justly when he is peeved.'" Cardoza v. Healthfirst, Inc., 210 F.Supp.2d 224, 234 n. 15 (S.D.N.Y.1999) (quoting Christoforou v. Ryder Truck Rental, Inc., 668 F.Supp. 294, 303 (S.D.N.Y.1987)).

Furthermore, Plaintiff's available evidence to support his testimony about the discriminatory or retaliatory nature of these incidents is lacking. Sullivan's own account of the allegedly racially charged comment is similar (Sullivan Dep., pp.52-53). Nothing in the statement is objectively or overtly racist, nor is it obviously directed at Plaintiff, such that it could independently create a hostile work environment. See Benedith v. Malverne Union Free School Dist., 38 F.Supp.3d 286, 314 (E.D.N.Y. 2014) ("[t]he offensiveness of the individual actions complained of is also a factor to be considered in determining whether such actions are pervasive."), quoting Carrero v. New York City Housing Auth., 890 F.2d 569, 578 (2d Cir. 1989). Similarly, Plaintiff's and Sullivan's versions of the story about telling a student not to take his class are similar, and both related to the student's individual needs. (Plaintiff Dep., p. 51-52; Sullivan Dep., p. 67). Finally, the two other instances to which Plaintiff refers as demonstrating discrimination or retaliation or contributing to a hostile work environment took place with other individuals present; however, Plaintiff cannot offer the names of any witness to support his assertions. (Plaintiff Dep., pp.48-49).

"It is axiomatic that mistreatment at work, [including] subjection to a hostile work environment or through such concrete deprivations as being fired ... is actionable [under § 1981] only when it occurs because of an employee's ... protected characteristic."

IAC/Interactive Corp., 2 F.Supp.3d at 516, quoting Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001).  Plaintiff's fails to raise a legitimate dispute as to any material fact regarding whether the work environment was the result of either racial or retaliatory animus, or to allow a reasonable finding that a hostile work environment existed. Accordingly, WDC is entitled to summary judgment on Plaintiff's Section 1981 hostile work environment claim.

### K.    Plaintiff cannot maintain § 1981 claims against ECC and Erie County.

With respect to defendants ECC and Erie County, "the express cause of action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units...." Jett v. Dallas Independent School District, 491 U.S. 701, 733, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); Brown v. New York State Dept. of Correctional Services, 583 F.Supp.2d 404, 410 (W.D.N.Y. 2008).  Irrespective of Plaintiff's ability to allege a *prima facie* case of retaliation under § 1981, Plaintiff has not alleged a cause of action under § 1983 to satisfy the requirements of Monell v. Dep't of Social Services, 436 U.S. 658 (1978). Patterson, 375 F.3d at 226 (plaintiff must show "that the challenged acts were performed pursuant to a municipal policy or custom") citing Jett, Monell.  Therefore, as Plaintiff concedes in his Opposition Memo, he cannot maintain § 1981 claims against ECC and Erie County.  (Opposition, p. 32).  See Gilbert v. New York State Police, 2011 WL 5080152 *3, FN 3 (§ 1983 is the exclusive federal damages remedy for violations of rights guaranteed under § 1981) (citing Jett, 491 U.S. at 733)[7].  Accordingly, Claim 3 is dismissed against ECC and Erie County.

---

7 Although there is some dispute as to whether the holding in Jett remains good law in light of Congress' addition of subsection (c) to § 1981, the weight of authority, and the absence of controlling Second Circuit authority, favor

### L.    New York Human Rights Law Claims

Finally, in Claims 4 and 5, Plaintiff alleges similar causes of action under the NY HRL against all defendants.  (Complaint, ¶¶41-44; ¶¶ 45-49).  On July 16, 2010, Plaintiff brought his state law discrimination and retaliation claims before the New York State Department of Human Rights.  (Docket No. 1, Complaint Exh. A).  Under New York Executive Law § 297(9), the NY HRL election of remedies provision, a district court lacks subject matter jurisdiction over such claims when a Plaintiff initially elects to pursue administrative remedies.  Moodie v. Federal Reserve Bank of New York, 58 F.3d 879, 881-882 (2d Cir. 1995) ("subject to the administrative convenience exception, a person who has filed an administrative complaint regarding discrimination is thereby deprived of his judicial cause of action").  In his Opposition, "Plaintiff concedes this court does not have subject matter jurisdiction over any claims by Plaintiff under the New York HRL…." (Opposition p. 33, n.1).  Accordingly, Claims 4 and 5 are dismissed.

## IV.  CONCLUSION

Clearly dismayed by the decrease in demand over time for his teaching skills, Plaintiff attempts to string together a 3-year series of events to paint a picture of long term discrimination and retaliation leading to fewer and fewer paychecks.  This court cannot second guess the business decisions of either WDC or ECC, nor can it overlook that Plaintiff's problems started with his own actions.  Plaintiff fails to put forth any evidence that supports a reasonable finding of discrimination or retaliation.  For the reasons stated above, Defendants' Motions are GRANTED.

---

following the Supreme Court's decision in Jett. See Brown v. N.Y. State Dept. of Corr. Servs., 583 F.Supp.2d 404, 410 n. 1 (W.D.N.Y.2008) (quoting Bond v. City of Middletown, 389 F.Supp.2d 319, 328 (D.Conn. 2005)). On a similar issue, the Second Circuit more recently cited Jett, unqualified, in an unpublished opinion. Gladwin v. Pozzi, 403 Fed.Appx. 603 (2d Cir. 2010) ("As the district court noted, [Plaintiff]'s § 1981 claims are encompassed by her § 1983 claims, and both are therefore analyzed under § 1983.")

## V.  ORDERS

IT HEREBY IS ORDERED, that Defendant ECC's Motion for Summary Judgment

(Docket No. 40) is GRANTED;  Defendant Erie County's Motion for Summary Judgment

(Docket No. 67) is GRANTED;  and Defendant WDC's Motion for Summary Judgment

(Docket No. 68) is GRANTED.


FURTHER, that the Clerk of the Court is directed to close this case.

SO ORDERED.


Dated:    June 18, 2015
          Buffalo, New York


                                          /s/William M. Skretny
                                        WILLIAM M. SKRETNY
                                      United States District Judge